Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 6822 | **DATE** | 9/10/2003 |
| **CASE TITLE** | THE DAVIS COMPANIES, INC. vs. EMERALD CASINO, INC., et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: The Court grants defendants' motion for summary judgment with respect to Counts II and V, and denies defendants' motion with respect to Count IV. [153-1] Status hearing set for 9/24/03 at 9:30 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | SEP 1 1 2003 date docketed | |
| | Notified counsel by telephone. | | | 211 |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | U.S. DISTRICT COURT | | |
| | Copy to judge/magistrate judge. | 03 SEP 11 AM 8:27 | date mailed notice | |
| CG | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THE DAVIS COMPANIES INC., a California corporation, <br><br> Plaintiff, <br><br> v. <br><br> EMERALD CASINO, INC., formerly known as HP, Inc., an Illinois corporation JOSEPH McQUAID, individually and as agent of HP, Inc.; DONALD F. FLYNN, individually and as agent of HP, Inc.; and KEVIN FLYNN, individually and as agent of HP, Inc. and of Donald F. Flynn., <br><br> Defendants | 99 C 6822 <br> Judge Ronald A. Guzman <br><br> DOCKETED <br> SEP 1 1 2003 |

## MEMORANDUM OPINION AND ORDER

Plaintiff has brought breach of contract, fraudulent misrepresentation and civil conspiracy claims against individual defendants Donald Flynn, Kevin Flynn and Joseph McQuaid (collectively, the "defendants"). Defendants have brought a motion for summary judgment on all claims. For the reasons set forth below, defendants' motion for summary judgment is granted with regards to Count II and V, and denied as to Count IV of the Second Amended Complaint (cited herein as "Compl.").

### Facts

This dispute arises from a meeting on December 1, 1998, between Kevin Flynn and Michael Colleran ("Colleran"), Executive Vice President of Davis Companies, Inc. ("Davis"), which allegedly gave rise to two oral contracts. The first oral contract was

1

between Emerald Casino, Inc., formerly HP, Inc. ("Emerald Casino" or "HP") and Davis.[1] Its alleged terms were that Davis would receive a 37.5% interest in HP in exchange for a $12 million capital contribution. The first oral contract was conditioned upon the passage of an amendment to the Illinois Riverboat Gambling Act, 230 ILCS 10/1 *et seq.* (the "amendment"), to permit HP's license to be used for a casino in Rosemont, Illinois. The second oral contract was between Kevin Flynn and his father, Donald Flynn, (collectively, the "Flynns") and Davis that guaranteed HP's performance of the first oral contract. The amendment, signed into law on June 25, 1999, permits the holder of a dormant license to renew and relocate its license to any community willing to accept a casino. *See* 230 ILCS 10/11.2 (2003).

HP possessed one of the ten riverboat gambling licenses in Illinois. HP's license expired on July 31, 1997, and the Illinois Gaming Board (the "Gaming Board") refused HP's application for a one-year renewal on June 27, 1997. Following a denial of HP's appeal of the Gaming Board's decision by the Hearing Officer on May 5, 1999, HP appealed that decision. In September 1999, following the passage of the amendment, HP filed for renewal and relocation of its license to Rosemont, Illinois. At all times relevant to these proceedings, HP has been in the process of appealing its license renewal application.

Donald Flynn, from 1996 until the present, has served as a member of HP's Board of Directors. From June 1996 until June 1999, Donald Flynn served as Secretary, Treasure and Vice President of HP. A 1996 stock purchase caused Donald Flynn to

---

[1] On August 16, 1999, HP changed its corporate name to Emerald Casino, Inc.

become owner of 44.6% of the outstanding common stock of HP, more than any other HP shareholder. (HP, Inc. Stock Ledger, Pl.'s R. 56.1 Stmt. Addt'l Facts Precl. Summ J., Ex.25.) It is not disputed that he owned this amount of stock on December 1, 1998. (Defs' Local R. 56.1 Stmt. Undisputed Facts ¶ 22.). Donald Flynn also possessed options and conversion rights to acquire up to 87% of HP's outstanding stock. Donald Flynn further had the power under the June 7, 1996 Stockholder Purchase Agreement (the "1996 Stockholder Agreement") between Donald Flynn and HP, to appoint a majority of the Board of Directors, so long as he owned more common stock than any other single stockholder. (Pl.'s Local R. 56.1 Stmt. Addt'l Facts Precl. Summ. J., Ex. 59; D. Flynn Dep. Ex.12 at EC001162.). In June 1999, prior to the signing of the amendment but after its passage by the legislature, Donald Flynn exercised options that made him owner of at least 75% of HP's outstanding shares. (D. Flynn Dep. at 439:8-442:9.)

On December 1, 1998, Kevin Flynn was not an officer, director, shareholder or employee of HP. On June 23, 1999, Kevin Flynn became CEO of HP.

Although the Second Amended Complaint brings five counts, only those against the individual defendants are before this Court on defendants' summary judgment motion. On June 13, 2002, the shareholders of Emerald Casino filed an involuntary bankruptcy petition against Emerald Casino. As a result of this bankruptcy filing, the case against Emerald Casino has been stayed. *See In re: Emerald Casino, Inc.*, Case No. 02 B 22977 (the "Emerald Bankruptcy"). Count II alleges breach of the second oral contract against the individual defendants, the Flynns. Count IV alleges fraudulent misrepresentation against Kevin Flynn, individually, and Joseph McQuaid and Donald Flynn. Count V alleges, in the alternative to Count IV, a civil conspiracy involving the

3

Flynns and Joseph McQuaid.

## Discussion

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In other words, the existence of *some* alleged factual dispute between parties will not overcome an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Summary judgment will be granted "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 250. The nonmoving party has the burden of producing "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The evidence of the nonmoving party is to be believed, and all justifiable inferences there from are to be drawn in his favor. *Anderson*, 477 U.S. at 255. However, if "the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50.

## The Second Oral Contract (Count II)

Although the second oral contract possesses terms sufficiently definite to be enforced, because Kevin Flynn lacked the ability to enter into a contract on Donald Flynn's behalf and otherwise could not perform its conditions in his individual capacity, summary judgment must be granted for Count II. Furthermore, both oral contracts are unenforceable as a matter of law because they contemplate the performance of illegal acts.

4

*Enforceability*

In order to be enforceable, a contract must be "so definite and so certain in all of its terms that a court can require the specific thing contracted for to be done." *Morey v. Hoffman*, 145 N.E.2d 644, 647 (Ill. 1957). The terms must be "clear, certain and free from ambiguity and doubt." *Id.* The requirement of definiteness applies with equal or greater force to oral contracts. *Perez v. Abbott Laboratories*, 1995 WL 86716, *8 (N.D.Ill. 1995) citing *Vandevier v. Mulay Plastics, Inc.*, 482 N.E.2d 377, 380 (Ill. App. Ct. 1st Dist. 1985). It is, however, unnecessary for the contract to provide for every collateral matter or every possible contingency that might arise. *Morey* 145 N.E.2d at 647. Although, a contract may be enforced even though some terms are left to be agreed upon, if the essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract. *Academy Chicago Publishers v. Cheever*, 578 N.E.2d 981, 984 (Ill. 1991).

In order for an oral contract to exist, the parties must have had a meeting of the minds with respect to the terms of the agreement and must have intended to be bound by the oral agreement. *Podolsky v. Alma Energy Corp.*, 143 F.3d 364, 369 (7th Cir. 1998). However, intent alone is not enough, and where the material terms and conditions are not ascertainable, there is no enforceable contract, even if the intent to contract is present. *Academy Chicago Publishers v. Cheever*, 578 N.E.2d 981, 983 (Ill. 1991).

Under the second oral contract, Davis alleges that Kevin Flynn, on behalf of him and his father Donald Flynn, promised that "the Flynns, as the controlling shareholders of HP, would take whatever actions were necessary to achieve the change of ownership in HP." (Compl. ¶ 70.) In exchange for this promise, Davis agreed "to proceed with its oral

5

contract with HP without a written contract and without a formal resolution of HP's Board of Directors." (Compl. ¶ 119.) Davis also agreed not to make the agreement public. (Pl.'s Local R. 56.1Stmt. Addt'l Facts Precl. Summ. J. ¶ 70.) The following excerpts from the deposition of Michael Colleran, Davis' agent, provide the terms of the second oral contract:

> "[Kevin Flynn] assured me that he had discussed this transaction with his father and has his authority and that they would-that we could trust them and that they would see that-they would do what it took to make the transaction happen."
>
> * * * *
>
> "I think it was a quid pro quo for his telling me that he had the authority of [his] father and he would see that the transaction was executed for [keeping the agreement both oral and confidential]. It gave me the confidence that I could trust him and rely on him to keep it oral. And I agreed to that."

M. Colleran Dep. at 608:1-24.

Thus, the second oral contract is similar to a "best efforts" clause. Illinois courts have enforced best efforts clauses and have not "categorically rejected best efforts clauses as vague and unenforceable." *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992). Further, the Bankruptcy's Court's ruling that the first oral contract for the sale of stock is not binding upon Emerald Casino does not bar specific performance of or otherwise render unenforceable the second oral contract.[2] Where individuals have promised to carry out the actions of a corporation and have the ability to do so, specific performance against those individuals may be granted. *Borg-Warner*

---

[2] The May 27, 2003 Order of the Bankruptcy Court in the case of the Emerald Bankruptcy entered summary judgment against Davis on his Proof of Interest and Proof of Claim. Davis' Proof of Interest Claim was based upon its request for specific performance of the first oral contract and its Proof of Claim requested damages, in the alternative, of not less than $250,000,000 under Count I of the Second Amended Complaint.

*Corp. v. Anchor Coupling Co., Inc.*, 156 N.E.2d 513, 518 (Ill. 1958). In *Borg-Warner*, the Illinois Supreme Court held that whether the company itself is bound is not controlling on a demand for the specific performance by controlling shareholders who had promised to "personally carry out the steps necessary to cause the company to transfer its assets" to the plaintiffs. Similarly, in *Schmidt v. The J.F. Schmidt Bros. Co.*, 111 N.E. 1025, 1028 (Ill. 1916), although the company was not bound because the contract was not executed on its behalf, the company owner had agreed "to wind up the corporation in a lawful manner within three months, to pay all accounts and bills of the corporation and not to use its name for any new work." The *Schmidt* court noted that it was within the company owner's "power to do or not to do these things" and that he may have lawfully performed as agreed. Thus, as majority shareholder and in light of the 1996 Stockholder Agreement, which gave Donald Flynn the power to have a majority of the Board of Directors consist of persons of his choosing, Donald Flynn possessed the ability to perform as agreed under the second oral contract. (Pl.'s Local R. 56.1 Stmt. Addt'l Facts Precl. Summ. J., Ex. 25, 59.) In light of *Borg-Warner* and *Schmidt*, whether the corporation is bound is irrelevant to finding an enforceable contract against the individual defendants.

*Agency*

Although the second oral contract may be specifically performed notwithstanding the enforceability of the first oral contract, Kevin Flynn lacked the authority to enter into a contract on Donald Flynn's behalf. The existence of any agency relationship and its nature and extent may be show by circumstantial evidence, but will not be presumed. *Kalman v. Bertacchi*, 373 N.E.2d 550, 556 (Ill. App. Ct. 1st Dist. 1978); *Schoenberger*

7

*v. Chicago Transit Authority*, 405 N.E.2d 1076, 1081 (Ill. App. Ct. 1st Dist. 1980). The burden of proving agency and the scope of authority falls upon the person seeking to charge the alleged principal, unless ratification by the principal of his agent's acts has occurred. *Yugoslav-American Cultural Ctr., Inc. v. Parkway Bank and Trust Co.*, 682 N.E.2d 401, 406 (Ill. App. 1997). The authority to act for another may be actual or apparent. *Schoenberger*, 405 N.E.2d at 1081. The issue in this case is whether Kevin Flynn possessed the apparent authority to act for Donald Flynn (as actual authority may not be demonstrated under these circumstances. (D. Flynn Dep. at 515:15-18.))

Apparent authority arises when a principal, through words or conduct creates a reasonable impression that the agent has authority to perform a certain act. *Mateyka v. Schroeder*, 504 N.E.2d 1289, 1295 (Ill. App. Ct. 5th Dist.1987); *Kalman*, 373 N.E.2d at 556; *Schoenberger*, 405 N.E.2d at 1081. The scope of the agent's authority may be ascertained by determining what persons of reasonable prudence, ordinarily familiar with business practices, in dealing with the agent might rightfully believe him to possess, based on the principal's conduct. *Mateyka*, 504 N.E.2d at 1295. It is further such authority "as a reasonably prudent man, exercising diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess." *Schoenberger*, 405 N.E.2d at 1081; *Yugoslav-American Cultural Ctr.*, 682 N.E.2d at 406. A third party who deals with an alleged agent has the obligation of reasonable diligence to verify both the existence and scope of the agent's authority. *Schoenberger*, 405 N.E.2d at 1081; *Yugoslav-American Cultural Ctr.*, 682 N.E.2d at 407.

Notwithstanding otherwise reasonably prudent behavior by the third party, he may not rely upon "the mere statements of the alleged agent, made outside the presence

of the principal and not subsequently approved by [the principal]" to establish the existence of a principal-agent relationship. *Yugoslav-American Cultural Ctr.*, 682 N.E.2d at 406. Because the principal is the source of power, the agent's authority may only be proved by tracing it to that source in some word or act of the alleged principal. *Id.*

Applying the above rules, Davis is unable to establish any evidence from which a trier of fact could reasonably conclude that an agency relationship existed between Kevin and Donald Flynn. Davis relies almost exclusively upon statements made by Kevin Flynn to Colleran. Kevin Flynn told Colleran on December 1, 1998 that "he spoke for his father, he discussed this transaction with his father, and his father agreed to it, and that they collectively controlled the company..." (M. Colleran Dep. 49:13-20.) After establishing that his father primarily controlled the company, Kevin Flynn told Colleran that because his father was "basically retired," he had been "delegated to run the family business with respect to this particular asset, but that his father was well aware of these discussions and had approved them." *(Id.* at 50:7-11.) Further, Davis' minute-by-minute accounting of the telephone calls placed by Kevin Flynn on December 1, 1998, is not sufficient to establish that Donald Flynn was apprized of and consented to his son's alleged negotiations with Davis. (Pl.'s Local R. 56.1 Stmt. Addt'l Facts Precl. Summ. J. ¶¶ 62-67.) Colleran admits that at no time during his meetings with Kevin Flynn did he observe Kevin Flynn make a telephone call to Donald Flynn (or to anyone else). (M. Colleran Dep. at 50:12-22.). Because the statements which Davis presents as the basis for the apparent agency contention are for the most part those of the alleged agent himself, the evidence is insufficient to establish this crucial element of plaintiff's claim.

Davis also suggests that other individuals had the impression that Kevin Flynn represented his father, Donald Flynn. (G. Reineke Dep. at 458:1-2.) However, no evidence has been presented that the beliefs of these other individuals were at any time communicated to Davis. Moreover, it is undisputed that Donald Flynn had no contact or direct involvement with Davis or its agents. Colleran did not speak to Donald Flynn on December 1, 1998, nor has he done so at any time. (M. Colleran Dep. at 189:6-10.) Marvin Davis has never met Donald Flynn, nor has he spoken with him regarding the first or second oral contracts. (M. Davis Dep. at 37:20-21, 100:22-101:4.)

No statement or action by Donald Flynn supports the notion that Kevin Flynn acted as his agent on December 1, 1998. Donald Flynn admits that his son has served as a liaison "on and off when I'm out of the country" during the last seven or eight years. (D. Flynn Dep. at 456:5-13.) However, Donald Flynn did not know of any contracts that Kevin Flynn negotiated on his behalf since 1996. (*Id.* at 458:9-15.) Davis further relies upon Donald Flynn's description of Kevin Flynn as the "point person" going forward because he would be on vacation to Richard Duchossois, David Filikin and Scott Mordell on October 28, 1998. (S. Mordell Dep. at 27:12-21.) However, no suggestion has been made that the parties of the October 28th meeting discussed potential involvement by Davis in a relocated casino or that the substance of this conversation was relayed to Davis-rather the discussions of this meeting concerned the possible common ground between horse racing and gambling industry, as well as Duchossois' involvement in a riverboat casino. (S. Mordell Dep. at 15:10-23:6; D. Filkin Dep at 18:4-30:6.)

*Ratification*

Finally, there is no evidence of Donald Flynn's ratification of the acts of Kevin

10

Flynn. Ratification may be express or inferred and occurs "where the principal with knowledge of the material facts of the unauthorized transaction, takes a position inconsistent with non-affirmation of the transaction." *Schoenberger*, 405 N.E.2d at 1081. Ratification also occurs where a principal attempts to seek or retain the benefits of the transaction. *Id*; *Mateyka*, 504 N.E.2d at 1297. Ratification is the equivalent to an original authorization of the acts of the supposed agent. *Schoenberger*, 405 N.E.2d at 1081; *Yugoslav-American Cultural Ctr.*, 682 N.E.2d at 408.

Davis contends that Donald Flynn, as well as Emerald Casino, have benefitted by Davis' lobbying efforts that helped achieve the passage of the amendment. (Compl. ¶ 14.) However, Davis admits that it would have pursued a change in legislation that would have given it an opportunity to compete for a license in Rosemont regardless of its alleged agreement with Emerald Casino, with but a few exceptions.[3] (M. Colleran Dep. at 140:1-12.) While it may be argued that as majority shareholder of Emerald Casino, Donald Flynn stands to personally benefit if Emerald Casino's license is reinstated and relocated to Rosemont, this alone is insufficient to establish ratification. Further, no benefit has yet been gained at the passage of the legislation sufficient to demonstrate ratification.[4]

Because Kevin Flynn lacked the ability to contract on Donald Flynn's behalf and because the second oral contract was for consideration that could only be lawfully

---

[3] Colleran stated that Davis "would have pressed for legislation that would give us the opportunity to participate in or compete for, as the case might be, a license in Rosemont."

[4] On March 6, 2001 the Illinois Gaming board rejected Emerald Casino's license Renewal Application. (Ex.85, Pl. Stmt. Additl Facts Precluding Summary Judgment.)

11

rendered by Donald Flynn, defendants' motion for summary judgment is granted as to Count II. Where defendants have agreed to guarantee an act of a corporation, and where there is no binding contract on that corporation, in a demand for specific performance of the guarantee, the defendants must possess the ability to perform that which they agreed to guarantee. *See Borg-Warner Corp.*, 156 N.E.2d at 518; *Schmidt*, 111 N.E. at 1028. As discussed above, on December 1, 1998, Donald Flynn had the ability to control the composition of majority of the Board of Directors of HP. However, on December 1, 1998, Kevin Flynn was neither a shareholder nor a director or officer of HP, and thus lacked the ability to specifically perform the terms of the second oral contract. (J. McQuaid Aff. ¶ 7.) Thus, in the absence of an agency relationship between Kevin and Donald Flynn, and in light of Kevin Flynn's inability to individually perform, summary judgment is granted in favor of the defendants as to Count II.

*Illegality*

Even if we were to find that Kevin Flynn was Donald Flynn's agent, the second contract together with the first oral contract, contemplates the performance of illegal acts which render it unenforceable as a matter of law. *U.S. Nursing Corp. v. Joseph Medical Ctr.*, 39 F.3d 790, 792 (7th Cir. 1994). Illinois courts have held that when a statute makes an act illegal, contracts for the performance of the act are deemed void and unenforceable. *Id.*

At least three sections of the Illinois Gaming Board Regulations (the "regulations") render the acts contemplated by the second oral contract illegal. The regulations provide that "an ownership interest in an entity with a finding of preliminary suitability or a holder of an Owner's license may only be transferred with leave of the

12

Board." 86 Ill. Adm. Code 3000.235(a). As confidentiality is one of the alleged terms of the second oral contract, disclosure to the Illinois Gaming Board, as required by law, was specifically prohibited by the second agreement. (Pl.'s Local R. 56.1 Stmt. Addt'l Facts Precl. Summ. J. ¶ 70.) The whole idea was to keep it oral and confidential. Further, the regulations impose "a continuing duty to disclose promptly any material changes to information provided to the board" upon licensees and applicants for licenses. 86 Ill. Adm. Code 3000.140(a) (2003). Even if an agreement to guarantee the sale of a 37.5% interest in HP were not a "material change," in the information provided to the Board, sub-section b(5) requires disclosure of "agreements to sell, grant, pledge, hypothecate or otherwise transfer or share an ownership interest or interests in an Owner's License." *Id.* Furthermore, the second oral contract was required to be disclosed under sub-section b(4) as an agreement "with or involving Key Persons and relatives of Key Persons." A Key Person includes "any individual with an ownership interest or voting rights of more than 5 percent in the licensee or applicant . . ." 86 Ill. Adm. Code 3000.222 (2003). On December 1, 1998, Donald Flynn qualified as such a Key Person for HP. (J. McQuaid Aff. ¶ 7.) Thus, any agreements involving Donald Flynn or Kevin Flynn, as a relative of a Key Person, required disclosure under the regulations. 86 Ill. Adm. Code 3000.140(b) (2003). The apparent total disregard of all parties for the possible impact of these regulations on their contemplated actions is surprising to say the least. The parties seem to be proceeding as if the object of their transactions, the ownership of a casino or license, was totally unregulated, purely a private concern, as opposed to a highly regulated activity.

Although by December 1, 1998, HP's license had expired and its renewal denied

13

by the Gaming Board, HP was in the process of appealing the Gaming Board's decision. (J. McQuaid Dep. at 400:21.) Thus, HP was still "considered an applicant for purposes of compliance with applicable statutory provisions and Board Rules." 86 Ill. Adm. Code 3000.445 (2003). Together with the first oral contract, of which it served as a guarantee, and standing alone, disclosure of the second oral contract was required by the regulations. Because it is undisputed that disclosure of Davis' alleged right to purchase shares and Flynn's alleged intent to transfer such shares has never been contemplated or completed, the second oral contract is unenforceable as a matter of law due to its illegality. For this reason also summary judgment is hereby granted as to Count II.

## Fraudulent Misrepresentation (Count IV)

Defendants have also moved for summary judgment as to Count IV and argue that Davis's reliance upon statements made by Defendants is unreasonable as a matter of law. (Defs.' Mem. Supp. Mot. Summ. J. at 28.) The defendants further argue that misrepresentations based upon future conduct are not actionable under a claim for fraud. (*Id.* at 32.) Because a genuine issue of material fact exists as to whether Davis reasonably relied upon statements by the individual defendants, and because promises of future conduct can be actionable so long as they are part of a scheme to defraud, summary judgment is denied with respect to Count IV.

The elements of a cause of action for fraud are: (1) an untrue statement of a material fact; (2) known or believed at the time to be false by its maker; (3) made with the intent to induce the plaintiff to act; and (4) relied upon by the defendant. *Mitchell v. Norman James Construction Co., Inc.*, 684 N.E.2d 872, 882 (Ill. App. Ct. 1st Dist. 1997). The plaintiff's reliance must be justified, and damages result from such reliance. *The*

14

*Delcon Group, Inc. v. Northern Trust Corp.* 543 N.E.2d 595, 604 (Ill. App. Ct. 2d Dist. 1989).

Promissory fraud, where the statement relates to future or contingent events, is generally not actionable in Illinois. *LaScola v. US Sprint Communications*, 946 F.2d 559, 569 (7th Cir. 1991); *Glass v. Kemper Corp.*, 949 F.Supp. 1341, 1351 (N.D.Ill. 1997); *Mitchell*, 684 N.E.2d at 882. However, an exception exists where the representation of intent as to future conduct is part of a scheme or device to accomplish the fraud. *Mitchell*, 684 N.E.2d at 882; *Glass*, 949 F.Supp. at 1351, citing *Bower v. Jones*, 978 F.2d 1004, 1011 (7th Cir. 1992). This exception applies where a party makes a promise of performance, not intending to keep the promise but intending for another party to rely on it, and where the other party relies on it to his detriment. *Glass*, 949 F.Supp. at 1351, citing *Bower*, 978 F.2d at 1011. Promissory fraud is a "disfavored cause of action in Illinois because fraud is easy to allege and difficult to prove or disprove." *Bower*, 978 F.2d at 1012. Thus, the plaintiff claiming that a statement was part of a scheme to defraud has a "deliberately high" burden of proof and must "be able to point to specific, objective manifestations of fraudulent intent." *Id.*

Davis has specifically alleged two misrepresentations by the defendants upon which a trier of fact could find that the plaintiff reasonably relied to its detriment. First, Davis alleges that Kevin Flynn represented that, if legislation were passed permitting Emerald to operate a casino in Rosemont, he and Donald Flynn would make Davis an owner of 37.5% of Emerald. (Pl.'s Local R. 56.1 Stmt. Addt'l Facts Precl. Summ. J. ¶¶ 49-50, 68-70.) Second, Davis alleges that McQuaid acknowledged to Colleran and Gene Reinke, an agent of Davis, that an agreement between Davis and Kevin Flynn (on HP's

15

behalf) had been reached. (Pl.'s Local R. 56.1 Stmt. Addt'l Facts Precl. Summ. J. ¶¶ 94-99.)

To be actionable, fraud must induce reliance. *Ampat/Midwest, Inc. v. Ill. Tool Works Inc.*, 896 F.2d 1035, 1041 (7th Cir. 1990). It must "be both believed (if it is not believed, it can hardly be described as fraud) and acted upon." *Id.* Reliance must be justified in light of the circumstances surrounding the misrepresentation. *LaScola*, 946 F.2d at 569. "The crucial question is whether the plaintiff's conduct was so unreasonable under the circumstances and in light of the information open to him, that the law may properly say that the loss is his own responsibility." *Runnemede Owners, Inc. v. Crest Mortgage Corp.*, 861 F.2d 1053, 1058-59 (7th Cir. 1988). However, "that a more cautious buyer might not have relied, might have smelled a rat, does not defeat liability," as there is no defense of contributory negligence to fraud. *Id.* at 1041. Illinois law is quite liberal in finding justifiable reliance. *Household Commercial Financial Services v. Schottenstein*, 1991 WL 86069 *5 (N.D.Ill. 1991). A plaintiff is barred only if he had notice of the fraud and engaged in deliberate or reckless risk taking. *Runnemede.* 861 F.2d at 1042. A plaintiff acts recklessly where he ignores a manifest danger. *Id.*

A trier of fact could conclude that Davis reasonably relied upon the defendants' representations in failing to insist upon a written agreement, joining its lobbying efforts with Emerald's, and thereby abandoning all other efforts to obtain an interest in a Rosemont casino. (M. Colleran Dep. at 606:22-608:24, 796:7-797:23.) There is evidence from which to conclude that Davis could reasonably have believed that Kevin Flynn had the ability to ensure that Davis became an owner of HP, either as agent of Emerald or as a member of the Flynn family. In early 1997, Kevin Flynn applied with

16

the Illinois Gaming Board to become "an owner and chief executive officer of HP." (K. Flynn Dep. at 144:25-145:25.) Kevin Flynn attended HP board meetings prior to becoming CEO of Emerald. (D. Flynn Dep. at 336:9-12; K. Flynn Dep. at 181:10-16.) At a meeting on November 25, 1998, McQuaid told Colleran that Kevin Flynn was the person with the authority to sell an ownership interest in HP. (M. Colleran Dep. at 29:19-30:12.) On June 23, 1999, Kevin Flynn became chairman and CEO of Emerald. (June 23, 1999, HP, Inc. Board Meeting Minutes, EC005103-5110, Pl.'s Local R. 56.1 Stmt. Addt'l Facts Precl. Summ. J., Ex. 63.) While Kevin Flynn lacked the authority to bind Donald Flynn to the second oral contract, his repeated assurances to Colleran that the Flynn family controlled the Board of Directors of HP were misrepresentations upon which a trier of fact could conclude Davis reasonably relied. Although Davis was cognizant of the existence of minority shareholders, Kevin Flynn told Colleran that the internal disputes among HP shareholders were not a concern to consider because "they [the Flynn family] control the company." (M. Colleran Dep. at 49:20.) He made further assurances to Colleran that he and his father "would do what it took to make the transaction happen." (M. Colleran Dep. at 608.) Thus, there is sufficient evidence to withstand a motion for summary judgment that Davis' reliance upon the assertions of Kevin Flynn and McQuaid was justifiable. Hence, defendants' motion for summary judgment as to Count IV is denied.

### Civil Conspiracy (Count V)

Civil conspiracy is a recognized cause of action in Illinois. *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994). A civil conspiracy consists of a combination of two or more persons for the purpose of accomplishing by concerted action either an

17

unlawful purpose or a lawful purpose by unlawful means. *Id.* A cause of action for civil conspiracy exists only if one of the parties to the agreement commits some act in furtherance of the agreement, which is itself a tort. *Id.* A civil conspiracy that alleges a tort as the underlying wrongful act is actionable so long as the claim includes additional defendants or new facts not already pled in the underlying tort. *Real Colors, Inc. v. Patel*, 974 F. Supp. 645, 651 (N.D.Ill. 1997); *see Cenco Inc. v. Siedman & Siedman*, 686 F.2d 449, 453 (7th Cir. 1982). As a civil conspiracy requires damages, "unless the plaintiff adds another defendant or new facts, a conspiracy count would merely result in another attempt to recover the same damages." *Real Colors*, 974 F. Supp. at 651. In this case, Davis has brought civil conspiracy claim against Kevin Flynn individually and against Donald Flynn and Joseph McQuaid-all of whom are defendants in the fraud claim. No new facts have been alleged beyond those set forth in Count IV, other than the "significant amounts of money" or "substantial financial benefits" that each defendant stands to gain. Further, no new damages have been alleged. (Compl. ¶¶ 150, 167.) For the foregoing reasons, defendants' motion for summary judgment as to Count V is hereby granted.

## Conclusion

For the reasons set forth above, the Court grants defendants' motion for summary judgment with respect to Counts II and V, and denies defendants' motion with respect to Count IV.

SO ORDERED: 9/10/03

ENTERED:

HON. RONALD A. GUZMAN
United States Judge